Filed 2/26/13  P. v. Duarte CA3

NOT **TO** BE **PUBLISHED**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

**(Sacramento)**

**----**

| | |
|---|---|
| THE PEOPLE, | C069087 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F06621) |
| v. | |
| JOSE CAMDELARIO DUARTE, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Jose Camdelario Duarte was convicted of first degree murder (Pen. Code, § 187, subd. (a))[1] with a deadly weapon enhancement (§ 12022, subd. (b)(1)) and arson of an inhabited structure (§ 451, subd. (b)).  The trial court sentenced defendant to 34 years to life in state prison.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the offenses.

On appeal, defendant contends the trial court erred in denying his request to instruct on voluntary manslaughter as a lesser included offense of murder. We shall affirm.

## FACTUAL BACKGROUND

On August 10, 2008, at about 2:00 a.m., security guards reported an apartment fire at the Tamron Ranch apartment complex in Sacramento. Firefighters soon arrived and extinguished the fire. Fire officials found the body of Alicia Ray inside one of the apartment's bedrooms. An arson investigator determined the fire was set intentionally. The point of origin was a mattress, and the fire could have been started by a cigarette lighter.

An autopsy determined that Ray died before the fire. The cause of death was ligature strangulation. A partially burned, used condom was found under Ray's body. There was no testable semen in the condom, possibly due to its burnt condition. A used condom and a blue "Rough Rider" condom label were found in the kitchen, wrapped in a paper towel. A DNA profile of the semen in this condom was impossible because there was no sperm in the semen. Multiple latent finger prints were found in the apartment, some of which were defendant's.

Defendant had two interviews with the police after Ray's body was found. He told the police that he did not kill Ray. Defendant said he had known Ray for a few years and reestablished contact with her after she recently returned from Texas. He had a girlfriend, India Love, and a young child with her, while he viewed Ray as his mistress. Regarding Ray, defendant said, "I don't love that bitch." According to defendant, Ray was supporting herself by stripping for men she met through Craigslist.

2

On the evening of Ray's death, defendant stopped at her apartment after work to have sex with her; he left her apartment between 12:00 a.m. and 12:15 a.m. He got dressed while still wearing a condom, and assumed it had fallen off at some point.

As he was leaving the apartment, defendant saw a man pull up in a white car and walk into Ray's apartment. He thought the man was one of Ray's clients. Defendant waited outside to see if Ray was okay. After 30 or 40 minutes, defendant pushed the unlocked apartment door open with his knuckles; he saw Ray bent over and first thought she was having sex. The man who drove up was also there. Defendant then had a gut feeling "[l]ike something is wrong but he's killing her." Defendant stayed in the apartment for about 30 seconds before leaving. The man left about 30 to 45 minutes later. Defendant then walked up to the apartment, looked in, and saw flames starting to pick up. He felt Ray was dead, but did nothing to help her. Defendant did not see the man well enough to describe him.

During the interview, defendant had a packet of cigarettes and a lighter in his pocket.

Using Ray's e-mail accounts, police determined that she scheduled a meeting with a man named Isaac Utter on the night she died. Utter told police he responded to Ray's Craigslist advertisement for adult services. He arrived at Ray's apartment in a maroon sedan at around 11:30 p.m., agreed to pay $40 for a lap dance, and later paid an additional $40 for a "hand job." Utter used a Rough Rider brand condom, which Ray wrapped in a paper towel and took to the kitchen. Treatment for lymphoma in 1999 had rendered him sterile. Utter engaged in small talk with Ray before leaving; he noticed she was using her cell phone at the end of the visit.

Text messages between Ray and defendant indicated that defendant was outside Ray's apartment during Utter's visit. When Utter showed up, Ray texted "He's here," and defendant replied, "so am I." Defendant also texted that he had seen Utter and that

3

he was outside Ray's apartment. When Ray texted defendant that Utter was giving her $80, defendant asked what for; Ray responded it was not for intercourse. Defendant later asked whether the session was over; Ray replied that she was done and waiting for Utter to leave. At 12:49 a.m., Ray texted that Utter had left, and defendant replied, "K."

Police also found texts between Ray and defendant on the days before her death. Defendant had advised Ray on pricing for her adult services, and promised to buy her a smart phone when she got more clients. Defendant told Ray he planned to post Ray on an escort Web site so he could get enough money to gain custody of his daughter. Defendant told Ray he "need[ed] to get more chicks than one." The texts also showed that defendant and Ray got into an argument a few days before her death, with defendant telling Ray that if she disrespected him, he would "beat [her] ass." Defendant moved his texts with Ray to the trash section of his cell phone after police contacted him on the morning of Ray's death.

Testifying, defendant said he first met Ray in 2006, and kept in touch with her after she moved to Texas. When Ray returned to Sacramento the two began a sexual relationship. Defendant knew Ray made money through adult services; he gave her advice on how to sell her services because it advanced his own sexual interests. He took none of Ray's profits, as prostitution was immoral and he detested pimps. Defendant wanted to be with Ray and eventually start a family with her.

On the night Ray died, defendant went to her apartment but stayed outside when he saw Utter enter the apartment at around midnight. Defendant entered the apartment when Utter left, after 30 to 45 minutes. He and Ray talked for about 15 to 20 minutes and then had sex; he left at around 1:50 a.m. As he was leaving, defendant saw another client pull up to the apartment.

Defendant waited outside the apartment until 2:20 a.m. Concerned for Ray, defendant entered the apartment and saw the man with Ray. Defendant did not intervene

4

because he thought Ray was getting paid for "kinky" sex. He left the apartment and waited for about 20 minutes. Seeing flames coming from the apartment, defendant went in; he saw Ray lying on the floor but did not help due to fear for his own safety. He then left the scene.

Defendant admitted calling Ray's cell phone at 3:00 a.m., after the fire, and to leaving a voicemail stating he had been at her apartment but she did not answer the door. He had hoped Ray would answer in spite of what he had witnessed.

On rebuttal, a detective testified that Ray's e-mail accounts showed no appointments after Utter's on the night she died.

## DISCUSSION

Defendant contends the trial court committed prejudicial error in declining his request to instruct on voluntary manslaughter as a lesser included offense. We disagree.

A trial court must instruct the jury on a lesser included offense whenever there is substantial evidence that the defendant is guilty of the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155, 162 (*Breverman*).) In this context, substantial evidence is that which a reasonable jury could find persuasive. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414.) Instructions on lesser included offenses need not be given where there is no evidence that the crime was less than that charged. (*Breverman, supra*, at p. 162.) In assessing a claim of failure to instruct on a lesser included offense, "we review independently the question whether the trial court failed to instruct on a lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

The court must instruct on voluntary manslaughter as a lesser included offense of murder where there is substantial evidence from which the jury could reasonably conclude the killing was committed in a sudden quarrel or in the heat of passion. (*Breverman, supra*, 19 Cal.4th at pp. 163-164 [voluntary manslaughter instruction was

5

required where there was evidence that a sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed upon property occupied by the defendant and smashed his vehicle, and the defendant's statement to police reflected his fear and panic].)

The standards for voluntary manslaughter upon a sudden quarrel or heat of passion are stated in *Breverman, supra*, 19 Cal.4th at page 163, and reiterated in CALCRIM No. 570, which says in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] . . . [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

The trial court denied defendant's request to instruct on voluntary manslaughter as a lesser included offense to murder. Defendant argues there was sufficient evidence to show that defendant killed Ray out of jealousy. In support of his claim, defendant notes that on the day before her death, he sent Ray a text asking if there is anything she needed to tell him before their relationship went any further. Ray had been mad at defendant because she was getting harassing messages from his girlfriend, but defendant reassured Ray they were still "together." The texts also indicated Utter was the first client Ray

6

entertained at her apartment, and defendant grew impatient while waiting outside for Utter to finish. Defendant also testified that he wanted to hurry up so he could get home to his girlfriend Love, and Love had been "lighting up" his phone that night. From this, defendant concludes there was sufficient evidence of jealousy, which can support heat of passion.

"Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709.) Thus, instruction on voluntary manslaughter or attempted voluntary manslaughter as a lesser included offense to murder or attempted murder is not warranted when the defendant denies killing or attacking the victim. (*Ibid.*; *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1021-1022 (*Sinclair*).)

Defendant attempts to distinguish these cases by noting dicta in *Sinclair* stating: "There are no doubt other scenarios in which a defendant's under-oath denial she or he committed a homicide may be colored by other testimony, which creates substantial evidence sufficient to support manslaughter instructions." (*Sinclair*, *supra*, 64 Cal.App.4th at p. 1020.) Assuming without deciding that the *Sinclair* dicta is correct, it has no application to this case. There is no evidence that defendant was jealous of Ray's vocation. The texts show defendant gave her advice on how much to charge for her services, would reward her for getting more clients, and would put her on an escort service Web site to get more clients. While defendant testified to his disapproval of prostitution and pimping, he nonetheless allowed it to advance his own sexual interests. Also, the texts show defendant intended to use money from Ray's business to get custody of his daughter.

There is no evidence that defendant, who told police regarding his relationship with Ray that "I don't love that bitch," was jealous of Ray's vocation or her performing a

7

sex act on Utter while defendant waited outside her apartment.  The trial court did not err in denying the requested instruction on voluntary manslaughter.

## DISPOSITION

The judgment is affirmed.


                                                  BUTZ           , Acting P.  J.


We concur:


      MAURO         , J.


      MURRAY       , J.